**In re Grand Jury Subpoena "Custodian of Records AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL–CIO LOCAL 248".**

**Misc. No. 516.**

United States District Court,
E. D. Wisconsin.

Nov. 12, 1975.

---

William J. Mulligan, U. S. Atty., by Charles N. Clevert, Asst. U. S. Atty., Milwaukee, Wis., for the United States.

James M. Shellow, Milwaukee, Wis., for Local 248.

## MEMORANDUM AND ORDER

REYNOLDS, Chief Judge.

Before the Court is a motion to quash certain portions of a subpoena duces tecum issued by the grand jury. For the reasons hereinafter stated, I have decided some of the matters before this branch but have referred others to Judge Robert W. Warren for decision.

### I.

The Milwaukee Independent Meat Packers Association ("Association") is a multi-employer bargaining unit consisting of certain companies engaged in the processing of meat products in the Milwaukee metropolitan area. The Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO Local 248 ("Local 248") is the collective bargaining representative of certain employees of the Association. On January 25, 1975, Local 248 commenced an economic strike against the Association.

The Association subsequently filed charges with the National Labor Relations Board ("Board"), alleging that Local 248 was engaged in unfair labor practices involving violence and threats of violence against the Association's nonstriking employees and supervisory personnel. The Board concluded that reasonable cause existed to believe that Local 248 had engaged and was engaging in conduct violative of § 8(b)(1) of the National Labor Relations Act

("Act"), 29 U.S.C. § 158(b)(1), and consequently issued a complaint pursuant to § 10(b) of the Act. Thereafter the Board petitioned the United States District Court for the Eastern District of Wisconsin, asking for temporary injunctive relief as authorized by § 10(j) of the Act, 29 U.S.C. § 160(j). *Squillacote v. Local 248, Meat & Allied Food Workers,* C.A.No. 75–C–64 (E.D.Wis.).

The matter was assigned to the branch of this court presided over by Judge Robert W. Warren. Judge Warren issued a temporary restraining order on February 11, 1975, and on March 21, 1975, granted a temporary injunction barring certain conduct pending final disposition of the § 8(b)(1) charges before the Board.

On May 9, 1975, the Board requested that Judge Warren "institute *sua sponte,* a prosecution of respondents named [Local 248 and eight of its members] * * * for criminal contempt of the Court." (Board's petition, p. 43.)

At the behest of counsel, Judge Warren heard argument on the propriety of the institution of criminal contempt proceedings, as well as the manner in which such prosecutions, if any, would ensue. On May 23, 1975, Judge Warren determined that he would proceed criminally against the respondents as prayed by the petitioning Board but took under advisement all issues respecting the manner in which any prosecutions for criminal contempt would proceed.

Thereafter, in a decision and order dated June 26, 1975, Judge Warren determined that the matter of criminal contempt would be submitted to the grand jury:

"Each of the nine respondents against whom criminal contempt is sought is alleged to have in some manner violated an injunctive order of this Court by engaging in proscribed strike misconduct. In view of the fact that the allegedly contemptuous conduct thus occurred outside the presence of the court, the procedural requirements of Rule 42(b), Fed.R. Crim.P. are applicable * * *. With respect to these requirements, respondents have sought that the criminal contempts proceed by grand jury indictment, if at all, rather than by simple notice.

" * * * [T]he Seventh Circuit Court of Appeals has determined that the right of grand jury indictment does not extend to criminal contempt proceedings * * *. * * *

"Nothing stated by the Seventh Circuit Court of Appeals, however, nor any other rule of law prevents this Court from exceeding minimal due process requirements and directing submission of this matter to the grand jury where such procedure might better serve the interests of justice. * * * Because of the nature of the contemptuous conduct alleged as against each of the nine respondents, this Court is of the opinion that there is much to be gained in terms of equity and judicial efficiency by employing the grand jury. * * *" *Squillacote v. Local 248, Meat & Allied Food Workers,* C.A.No. 75–C–65 (E.D.Wis.)

Judge Warren further ordered that these matters of criminal contempt were to be prosecuted before the grand jury by the United States Attorney or his authorized representative. Grand jury proceedings were accordingly initiated.

On August 14, 1975, Local 248 and certain of its members filed a motion to instruct the grand jury on the law of criminal contempt. On that same date the custodian of records filed a motion to quash a subpoena duces tecum which directed him to produce certain union records before the grand jury. The following day, Local 248 and certain of its members filed a motion to voir dire the members of the grand jury for prejudice.

These motions were assigned to this branch of the court on August 19, 1975, Judge Warren being unavailable to hear

them and the grand jury being scheduled to meet the next day. The Government was ordered to respond, and the matter came on for a hearing the following morning, August 20, 1975.

For the reasons stated in open court at that hearing, I denied the motion to instruct the grand jury and the motion to voir dire the grand jury. The motion to quash the subpoena duces tecum was considered separately as to each paragraph of the subpoena duces tecum, the relevant portions of which read as follows:

1. "Any and all documents containing lists of all union members at the time the union went on strike against the Milwaukee Independent Meat Packers Assn. on Jan. 25, 1975.

2. "Documents containing a list of all union members who went on strike at the time indicated above.

3. "Documents containing lists of all persons who have resigned the union since the strike began.

4. "All documents and rosters which show the union members who have been on the picket lines each day since February 11, 1975 through August 18, 1975.

5. "All documents utilized to advise union members of the restraining orders issued by United States District Court Judge Robert W. Warren, of the Eastern District of Wisconsin, (directed to the union) on February 11, 1975 and March 21, 1975.

6. "All documents and receipts signed by union members which acknowledge notice of the court orders referred to hereinabove.

7. "All documents and written instructions which have been given to picket captains, union stewards, union officers and union members regarding their strike activity and picket conduct since the beginning of the strike on January 25, 1975.

8. "Written reports and documents authorized to be made by union agents including picket captains, union officers and other members while on the picket lines.

9. "All documents evidencing disciplinary measures administered to all picket captains, union stewards, union officers and union members for misconduct on and away from the picket lines since Judge Warren's order of February 11, 1975.

10. "Copies of union's local and international constitutional and by-laws.

11. "All documents containing license numbers and home addresses of non-striking employees of the Milwaukee Independent Meat Packers Association.

12. "Roster sheets signed by union members upon receipt of their strike pay." (Numbers added by the Court.)

I declined to quash paragraphs 5, 6, 7, 8, 9, and 10 and that portion of paragraph 11 relating to the time period between March 5 and May 1, 1975; I took under advisement the remainder of paragraph 11 and paragraphs 1, 2, 3, 4, and 12. The disposition of the motion to quash those paragraphs is the matter presently before the Court.

II.

The custodian made three arguments in support of his motion to quash the subpoena duces tecum. First, he asserted that the subpoena sought the production of documents and records not relevant or material to the matters of criminal contempt referred to the grand jury by Judge Warren's order of June 26, 1975. Second, the custodian alleged that the subpoena was being improperly used to discover evidence for pending criminal contempt charges. Finally, the custodian claimed that the subpoenaed documents and records were privileged from disclosure by the First Amendment to the Constitution and § 7 of the National Labor Relations Act, 29 U.S.C. § 157.

In my opinion, the issues of improper discovery and constitutional and statutory privilege should not be considered un-

til the question of the relevancy and materiality of the subpoenaed records and documents is disposed of. For the reasons set forth herein, I conclude that the determination of relevancy and materiality must be made by Judge Warren.

In reaching this conclusion, the Court has had to consider the allowable scope of the grand jury's investigation. At oral argument, the custodian asserted that Judge Warren's order of June 26, 1975, delineated the boundaries of grand jury inquiry. That order, the custodian argued, incorporated by reference the Board's petition of May 9, 1975, which alleged specific acts of criminal contempt by the union and eight of its members on twenty-four particular dates. The custodian claimed that any inquiry reaching beyond those acts by those individuals on those dates was irrelevant and immaterial to any matter properly before the grand jury.

In contrast, the Government argued that Judge Warren's order was not limited to the matters contained in the Board's petition but included within its scope any acts by any individuals constituting criminal contempt of Judge Warren's injunctive orders. Had the Government stopped at this point, the matter could have been readily resolved by referring the parties to Judge Warren for an interpretative ruling as to the breadth and reach of his order of June 26, 1975. The Government went on, however, to assert that Judge Warren's order not only *did not* limit, but *could not* limit the scope of the investigation. "Even if Judge Warren had stated who and what the grand jury could investigate, he would have been acting without authority." (Government's brief in response to motion to quash subpoena, p. 2.) This assertion by the Government of an inherent grand jury power to investigate matters of criminal contempt, not derived from and thus not limited by Judge Warren's order of reference, requires an examination and review of the possible source of grand jury jurisdiction in this area.

## III.

■ The first possibility to be considered is that matters of criminal contempt are violations of federal criminal law, and thus independently within the jurisdiction of the grand jury. To this end the Court has examined the relevant statutory provisions and has concluded that matters of criminal contempt, *per se*, do not independently violate federal criminal laws.

The Court's power to inflict punishment for contempt of its authority is derived from 18 U.S.C. § 401:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

When the Court seeks to impose the criminal contempt sanction, the procedural requirements of Rule 42, Federal Rules of Criminal Procedure, must be met:

"(a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

"(b) *Disposition Upon Notice and Hearing.* A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and described it as such.

The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."

The criminal contempt power of the Court is also subject in certain circumstances to the limitations of 18 U.S.C. §§ 402, 3285, 3691, and 3692.

These provisions merely establish the authority and provide a procedure for the punishment of criminal contempt and do not, as a separate matter, make criminal the acts so punished.

That would, however, appear to be the effect of 18 U.S.C. § 1509:

"Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime."

Section 1509 was enacted as part of the Civil Rights Act of 1960, Pub.L. 86–449, Title I, § 101, 74 Stat. 86 (May 6, 1960). The section apparently arose out of Congress' concern that "[u]nder Federal procedure, an individual cannot ordinarily be held in contempt of court unless he was either a party against whom the decree was issued or was acting in concert with such a party." 1960 U.S.Code Cong. & Admin.News, at p. 1942. The bill reported out of the House committee would have limited § 1509 to "court orders for school desegregation purposes," *Id.* at p. 1941, but this limiting language obviously did not appear in the bill finally adopted.

The reported decisions in which an indictment based on § 1509 has actually issued are few. However, in each case the crime charged consisted of violent acts in opposition to a school desegregation decree by persons not apparently parties to the injunctive order. *United States v. Bruce,* 33 F.R.D. 133 (N.D.Miss. 1963); *Rosecrans v. United States,* 378 F.2d 561 (5th Cir. 1967); *United States v. Hayes,* 444 F.2d 472 (5th Cir. 1971), cert. denied 404 U.S. 882, 92 S.Ct. 210, 30 L.Ed.2d 163 (1971); *United States v. Fruit,* 507 F.2d 194 (6th Cir. 1974).

A review of those cases in which § 1509 has been mentioned in the absence of an actual indictment discloses that in each instance § 1509 has been invoked in the context of school desegregation, *Bush v. Orleans Parish School Board,* 191 F.Supp. 871 (E.D.La.1961), aff'd 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961); *Stanley v. Darlington County School District,* 313 F.Supp. 439 (D.S.C.1970); *Dowell v. Board of Education of Oklahoma City Public Schools,* 338 F.Supp. 1256 (W.D.Okla.1972), aff'd 465 F.2d 1012 (10th Cir. 1972), cert. denied 409 U.S. 1041, 93 S.Ct. 526, 34 L. Ed.2d 490 (1972); *United States v. Barnett,* 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); or voter discrimination, *Clerk v. Boynton,* 362 F.2d 992 (5th Cir. 1966).

*Clark v. Boynton,* supra, is the only case in which the scope and reach of § 1509 received direct comment. In that case a local sheriff had been convicted of contempt for violating a decree issued in aid of voter registration efforts in Selma, Alabama. In the course of reviewing that conviction, the Fifth Cir-

cuit mentioned § 1509 and made the following observation in a footnote:

"We have discovered no judicial interpretation of this provision * * *. The legislative history indicates that its primary purpose is to reach interference with school desegregation orders by individuals who are not parties against whom the orders were issued, nor acting in concert with such parties, and who are thus not usually subject to contempt sanctions. * * * We express no opinion on the ultimate applicability of this section either generally or as to Sheriff Clark's conduct." *Clark v. Boynton*, 362 F.2d 992, 997 n. 14 (5th Cir. 1966).

As a practical matter, § 1509 has only been invoked in cases where racial discrimination is at issue. The significance of this *de facto* limitation, however, must be balanced against the import of congressional action striking the desegregation decree limiting language contained in the bill originally reported out of the House committee. This facet of the legislative history argues against a construction of § 1509 which would limit its applicability to situations involving racial discrimination.

There nevertheless remains the question of whether § 1509 should be construed to reach interference with injunctive orders by individuals who are parties against whom the orders were issued, or acting in concert with such parties, and who thus have traditionally been subject to the contempt power of the court (hereinafter referred to as "parties" and "privies").

The applicability of § 1509 to parties and privies has never been directly ruled upon. *United States v. Barnett*, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964), contains an indirect suggestion that the section is available as against one party to a decree. In that case, the Court ruled that Governor Ross Barnett was not entitled to a jury trial of criminal contempt charges brought against him for violating a Fifth Circuit Court of Appeals' order directing the admis-

sion of James Meredith to the University of Mississippi. A threshold issue in that case was the applicability of 18 U.S.C. § 402 and 18 U.S.C. § 3691 which operate to confer a right to jury trial in criminal contempt prosecutions where the acts alleged as constituting the contempt " * * * constitute also a criminal offense under any statute of the United States * * *." 18 U.S.C. § 402. The majority ruled that §§ 402 and 3691 were inapplicable to a decree issuing from the Court of Appeals and did not reach the question of whether Governor Barnett's acts constituted a violation of § 1509.

Justice Goldberg, joined by Justice Douglas and Chief Justice Warren, dissented from the majority's limitation of §§ 402 and 3691 to violations of decrees issuing from district courts and thus reached the § 1509 issue:

"The second relevant question in deciding whether defendants have a statutory right to a jury trial is whether 'the act or thing done or omitted also constitutes a criminal offense under any Act of Congress . . . .' 18 U.S.C. § 3691. This is not in dispute here. The question certified by the Court of Appeals specified that 'the acts charged as constituting the alleged disobedience were of a character as to constitute also a criminal offense under an Act of Congress . . . .' While the Court is not bound by the facts assumed in a certified question, it is clear here that contemners' alleged acts would constitute violations of 18 U.S.C. (Supp. IV) § 1509. The Government does not dispute this." *United States v. Barnett*, 376 U.S. 681, 735–736, 84 S.Ct. 984, 1010, 12 L.Ed.2d 23 (1964).

Of course, this suggestion of § 1509's applicability to parties and privies is contained in a dissenter's discussion of an assumed fact relevant to an issue not reached by the majority. Whatever authority the quoted passage may have must be weighed against the practical

and perhaps constitutional implications of such a construction of § 1509.

The problem, of course, is that § 1509, if read to reach parties and privies, will have the effect of transforming otherwise noncriminal decree resistance into a criminal offense. Admittedly, § 1509 is limited in scope to acts of violence or threats of violence, and perhaps all such acts should be made criminal. But the rendering of otherwise noncriminal acts criminal has the side effect of bringing into play §§ 402 and 3691:

"Any person, corporation or association willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia, by doing any act or thing therein, or thereby forbidden, if the act or thing so done be of such character as to constitute also a criminal offense under any statute of the United States or under the laws of any State in which the act was committed, shall be prosecuted for such contempt as provided in section 3691 of this title and shall be punished by fine or imprisonment, or both.

"Such fine shall be paid to the United States or to the complainant or other party injured by the act constituting the contempt, or may, where more than one is so damaged, be divided, or apportioned among them as the court may direct, but in no case shall the fine to be paid to the United States exceed, in case the accused is a natural person, the sum of $1,000, nor shall such imprisonment exceed the term of six months.

"This section shall not be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and all other cases of contempt not specifically embraced in this section may be punished in conformity to the prevailing usages at law." 18 U.S.C. § 402.

"Whenever a contempt charged shall consist in willful disobedience of any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing or omitting any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense under any Act of Congress, or under the laws of any state in which it was done or omitted, the accused, upon demand therefor, shall be entitled to trial by a jury, which shall conform as near as may be to the practice in other criminal cases.

"This section shall not apply to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States." 18 U.S.C. § 3691.

Although not explicitly so limited, §§ 402 and 3691 have been judicially construed to apply only to criminal contempt proceedings. *Parker v. United States,* 126 F.2d 370 (1st Cir. 1942) (§ 402); *United States v. Onan,* 190 F.2d 1 (8th Cir. 1951), cert. denied 342 U.S. 869, 72 S.Ct. 112, 96 L.Ed. 654 (1951) (§ 3691).

Sections 402 and 3691 do not apply in the particular circumstances set forth in the final paragraph of each section. But in cases falling outside those exceptions, a holding that certain contemptuous acts are independently criminal violations of § 1509 would give the contemnor a § 3691 right to a jury trial in the criminal contempt proceeding. The extension of the right to jury trial to criminal contempts involving force or violence, regardless of the size of the fine or term of imprisonment imposed, would seemingly run contrary to the estab-

lished law in this area, *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), particularly where the injunction violated was issued pursuant to the National Labor Relations Act, *Muniz v. Hoffman*, 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975).

Of even more serious consequence is that fact that the interaction of § 402 and a § 1509 which reached parties and privies would limit the penalties which could be imposed upon the contemnor. The maximum penalty available under § 1509 is a $1,000 fine and imprisonment for one year. In criminal contempts falling within § 402, the fine payable to the United States may not exceed $1,000 and imprisonment may not exceed six months. Thus, the cumulative sanction which the court might impose on a contempt falling within both §§ 1509 and 402 could not exceed a $2,000 fine and imprisonment for a year and six months. Such a limitation would diminish the power of the court to meaningfully punish criminal contempt, and thereby eviscerate the Court's ability to deter those who would willfully violate its orders.

This Court will not readily infer an intent by Congress to impose such limits on the criminal contempt powers of the courts, particularly when nothing in the legislative hsitory of § 1509 suggests such an intent. Moreover, if such an intent were imputed, a constitutional problem might well be presented by the ensuing limitation of the court's criminal contempt powers.

In *Michaelson v. United States*, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924), the Court considered the constitutionality of provisions presently recodified in 18 U.S.C. § 402. In upholding the constitutionality of those provisions, the Court observed at page 66, 45 S.Ct. at page 20:

> " * * * The statute now under review * * * is of narrow scope, dealing with the single class where the act or thing constituting the con-

tempt is also a crime in the ordinary sense. It does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined. *Neither do we think it purports to reach cases of failure or refusal to comply affirmatively with a decree—that is to do something which a decree commands—which may be enforced by coercive means or remedied by purely compensatory relief.* If the reach of the statute had extended to the cases which are excluded a different and more serious question would arise. * * * " (Emphasis added.)

These various practical and constitutional problems can be avoided by a determination that § 1509 is inapplicable to parties and privies. The intent of Congress was clearly to expand rather than restrict the arsenal of weapons available against persons interfering with court decrees, and this intent can be effectuated by limiting § 1509 to those persons who are not parties or privies to a decree, and thus beyond the traditional reach of the contempt sanction. In so limiting § 1509, the full power of the criminal contempt sanction is preserved with respect to parties and privies.

■ In determining the applicability of § 1509 to the actions here at issue, the Court is guided by the "familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). Accordingly, the Court holds that § 1509 is inapplicable to the actions of persons party or privy to a temporary injunction issued under the authority of § 10(j) of the National Labor Relations Act.

## IV.

If matters of criminal contempt do not *per se* violate federal criminal law, the Government's assertion of independent grand jury jurisdiction in this case may find somewhat limited support in the oft-cited dicta that "prosecution of criminal contempt may follow from indictment or presentment of the grand jury." *United States v. Bukowski*, 435 F.2d 1094, 1103 (7th Cir. 1970), cert. denied 401 U.S. 911, 91 S.Ct. 874, 27 L. Ed.2d 809 (1971).

A presentment is the written notice made by members of the grand jury of an offense, the commission of which is within the grand jury's own knowledge or observation. It is thus significant that in those cases where contempt prosecutions followed grand jury presentment, the conduct alleged to be contemptuous occurred *in the presence of* the grand jury. See, e. g., *In Re Meckley*, 137 F.2d 310 (3d Cir. 1943), cert. denied 320 U.S. 760, 64 S.Ct. 69, 88 L.Ed. 453 (1943); *Hooley v. United States*, 209 F.2d 219 (1st Cir. 1954), cert. denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954); *United States v. DeSimone*, 267 F.2d 741 (2d Cir. 1959), vacated as moot 361 U.S. 125, 80 S.Ct. 253, 4 L.Ed.2d 167 (1959).

It is similarly significant that in two of the three cases where a criminal contempt prosecution has followed a grand jury indictment, the defendant was indicted for acts occurring before the grand jury. *United States v. Sternman*, 415 F.2d 1165 (6th Cir. 1969), cert. denied 397 U.S. 907, 90 S.Ct. 903, 25 L. Ed.2d 88 (1970); *United States v. Leyva*, 513 F.2d 774 (5th Cir. 1975).

There is thus only one case, *United States v. Mensik*, 440 F.2d 1232 (4th Cir. 1971), where the defendant has been prosecuted for criminal contempt following an indictment based on acts taking place outside the grand jury room.

These cases, however, do not affirmatively establish the grand jury's *authority* to indict persons for criminal contempt. Indeed, two of the three indictment cases, as well as all three of the presentment cases, may be confined to the proposition that the grand jury may report to the court which impanelled it any misconduct occurring in its presence. The propriety of proceeding by indictment has been actually considered in only two of these cases.

In the first case, *United States v. Mensik*, supra, the appellant challenged his conviction for criminal contempt by asserting that the notice provisions of Rule 42(b), Federal Rules of Criminal Procedure, had not been met. In relevant part, that section provides that criminal contempt for conduct occurring outside the presence of the court—

> "  *  *  *  shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. *  *  *  *"

The *Mensik* Court held that under the total circumstances of the case, which included the indictment. "the notice requirements of rule 42(b) were fully complied with." 440 F.2d 1232, 1234. The appellant, however, had also asserted that "[t]he Grand Jury had no right to indict the appellant for Criminal Contempt  *  *  *  as this was a violation of Rule 42–B." *Id.*, at 1233. In rejecting that contention, the Court stated:

> "Although indictment is not necessary for a prosecution for criminal contempt, it is permissible *so long as the notice requirements of rule 42(b) are satisfied.*" (Emphasis added.) *Id.*, at 1234.

In the second case, *United States v. Leyva,* supra, the appellant was indicted and convicted for refusing to testify before the grand jury after immunity had been granted. The appellant challenged his conviction on the grounds that "the court did not consider using the civil contempt sanction prior to instituting criminal contempt proceedings and thus violated the principle of *Shillitani v. United States,* 384 U.S. 364, 371 [86 S. Ct. 1531, 16 L.Ed.2d 622] * * * (1966), that 'a court must exercise "[t]he least power adequate to the end proposed." ' * * * " 513 F.2d 774, at 777. The Court agreed that "[b]y not returning Leyva to the court upon his refusal to answer questions as directed by the court, the Government effectively precluded the court from exercising its discretion as to whether to proceed in civil contempt * * * or to require a criminal contempt hearing," *Id.,* at 779, but emphasized the appellant's tardiness in failing to raise the objection until after the Government had rested its case at trial, some six months after the indictment had been returned.

The Court noted that "proceedings upon * * * indictment present an appearance of some irregularity," and that "[t]he Government in pursuing this criminal contempt conviction by means of indictment ignored Fed.R.Crim.P. 42(b)," *Id.* at 777, but declined to set aside the conviction on that ground:

" * * * We do not believe this possible defect prejudiced any substantial right of defendant and thus does not constitute plain error requiring our review. Fed.R.Crim.P. 52(b). *The Supreme Court has not precisely passed on the question of whether Rule 42(b) sets forth the exclusive method of processing a criminal contempt charge,* but in *Green v. United States,* supra, [356 U.S. 165, 187 [78 S.Ct. 632, 2 L.Ed.2d 672] (1958)] the Court indicated it was not and presumably approved prosecution of criminal contempt by indictment, stating:

'[I]t is clear that criminal contempts, although subject * * * to sentences of imprisonment exceeding one year, need not be prosecuted by indictment under the Fifth Amendment.'

The court in *United States v. Mensik,* supra [440 F.2d 1232] approved prosecution of criminal contempt by indictment *as long as the notice requirement of Rule 42(b) was met.* In the present case the indictment gave Leyva adequate notice of the act charged as a criminal contempt. He was represented by counsel and given adequate time to prepare a defense." (Emphasis added.) *Id.* at 778.

Rule 42(b) provides that certain criminal contempts shall be prosecuted "on notice." The rule provides, however, that the necessary "notice" may be given by either of two means. Regardless of which means is used, the notice given must contain the time and place of hearing, allow a reasonable time for defense preparation, state the essential facts constituting the criminal contempt charged, and describe it as such. Under the first method of notice, the judge makes an oral statement in open court in the presence of the defendant. The adequacy of the notice so given can be determined by examining the Court's oral statement. In contrast, the second procedure requires an order to show cause or an order to arrest issued by the Court upon the application of the United States Attorney or an attorney specially appointed for that purpose. The adequacy of the notice given under this procedure is determined by examining the "total" notice which goes beyond the Court's order to encompass the application.

The presentment and indictment cases seemingly hold that the presentment or indictment can be considered the constructive equivalent of an application, and, consequently, that the fact and substance of the presentment or indictment may be considered in determining the

*adequacy* of the notice given. If the trial judge accepts the presentment or indictment—in effect as an application —and subsequently issues the appropriate order, the requirements of Rule 42(b) are met.

It is an inversion of the presentment and indictment cases to suggest that they stand for the proposition that the grand jury somehow has the independent power to *initiate* criminal contempt proceedings. To the contrary, the cases suggest that the existence of a presentment or indictment goes only to the question of the *adequacy* and not the *fact* of notice.

 Recognition of an inherent grand jury power to commence criminal contempt prosecutions would undermine the power which is properly that of the court. Criminal contempt is a *sui generis* proceeding to vindicate the authority of the court and the integrity of its proceedings. It is the court which is offended and not the grand jury. Rule 42(b) accordingly requires that under either method of notice, the step actually initiating the prosecution must be taken by the Court. A contrary result would deprive the Court of its recognized authority to control the conduct of a criminal contempt proceeding. See *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965).

### V.

The Court having concluded that the grand jury is without independent authority to inquire *sua sponte* into matters of criminal contempt, it necessarily follows that the grand jury is acting in this area under the authority of Judge Warren's order of July 26, 1975. If Judge Warren's order confers the authority, it in turn must demarcate the boundaries of appropriate grand jury activity.

As previously noted, the relevancy and materiality of the materials sought should be determined before the other grounds asserted in support of the motion to quash the subpoena duces tec-

um are considered. The relevancy and materiality of the documents and records here sought must be determined with reference to Judge Warren's order submitting these matters to the grand jury. This Court concludes, however, that a question requiring the interpretation and construction of a judicial order should properly be decided by the judge issuing that order.

It is therefore ordered that the above-captioned matter be reassigned to Judge Warren for purposes of all further proceedings.